STATE OF HAWAI`I, Plaintiff-Appellee,
v.
WILLIAM EDWARD WERLE, Defendant-Appellant
No. 28653
Intermediate Court of Appeals of Hawaii.
March 11, 2009.
On the briefs:
Phyllis J. Hironaka, Deputy Public Defender, for Defendant-Appellant.
Justine Hura, Deputy Prosecuting Attorney, County of Maui, for Plaintiff-Appellee.

MEMORANDUM OPINION
RECKTENWALD, C.J., FOLEY and FUJISE, JJ.
Defendant-Appellant William Edward Werle (Werle) appeals from the Judgment filed on July 12, 2007 in the District Court of the Second Circuit, Wailuku Division (district court).[1]
At the conclusion of a bench trial, the district court found Werle guilty of Count One, Operating a Vehicle Under the Influence of an Intoxicant (OVUII), in violation of Hawaii Revised Statutes (HRS) § 291E-61(a) and/or (d) (Supp. 2006), and not guilty of Count Two, Operating a Vehicle After License and Privilege have been Suspended or Revoked for Operating a Vehicle Under the Influence of an Intoxicant (OVLSR), HRS § 291E-62 (2007 Repl.).[2]
On appeal, Werle claims the district court (1) erred and denied him his due process rights by admitting into evidence the results of a blood alcohol test because the test results were fatally unreliable, and (2) erred by denying his October 2, 2006 Motion to Dismiss With Prejudice (Motion to Dismiss) because prosecution of the offenses was barred under article I, section 10 (double jeopardy clause) of the Hawai`i Constitution and/or HRS § 701-111 (1993).

I. BACKGROUND
On June 6, 2006, Werle was operating a motor vehicle on South Kihei Road when Officer Manlapao observed Werle exceeding the posted speed limit, in violation of HRS § 291C-102 (Supp. 2005). Officer Manlapao also observed Werle disregard a single solid white line, in violation of HRS § 291C-38 (2007 Repl). Officer Manlapao stopped Werle, subsequently arrested Werle for OVUII and OVLSR, and issued a citation to Werle for Speeding and Disregarding a Single Solid White Line (White Line).
Werle posted bail on the OVUII and OVLSR charges and was given a court appearance date of August 3, 2006. Werle was not given an appearance date for the citation. Werle did not contest the citation, and on July 14, 2006, he paid $214.00 in fines for the Speeding and White Line infractions.
The State of Hawai`i (State) filed a complaint on July 14, 2006, charging Werle with OVUII and OVLSR.
On October 2, 2006, Werle filed the Motion to Dismiss. Citing to HRS § 701-111, Werle argued that because he had already been prosecuted and punished (by paying his fines) on the two traffic infractions that arose out of the same set of facts and conduct relied upon to charge him with OVUII and OVLSR, double jeopardy barred the criminal prosecution for OVUII and OVLSR.
In the State's opposition memorandum to the Motion to Dismiss, the State argued that double jeopardy did not attach to traffic citations that were uncontested, monetary assessments under HRS § 291D-9 were not intended as punishment and were not essentially criminal in nature, and the purpose of HRS Chapter 291D was not to preclude prosecution of criminal offenses where a traffic infraction was committed in the same course of conduct.
The district court denied the motion, stating:
The fact in this case that Mr. Werle has allowed two of the citations that he received at the stop back in June of 2006, chose not to contest them  he could have chosen to do it  clearly those matters if he chose to contest them, could not be prosecuted separately. But the fact that he's treated them under the statutory scheme of 701-109 make [sic] an exclusion.
At trial, Officer Manlapao testified that after stopping Werle, he approached the driver's side of the vehicle and asked for Werle's driver's license, registration, and proof of insurance. As he received the requested paperwork, Officer Manlapao detected the odor of liquor on Werle's breath. Officer Manlapao returned to his police vehicle to verify Werle's documentation. While Officer Manlapao was checking the documents, contrary to Officer Manlapao's instructions, Werle exited his vehicle. Officer Manlapao saw that Werle had difficulty walking straight and appeared to be staggering. Officer Manlapao asked Werle if he would participate in a field sobriety test (FST), and Werle agreed. Officer Manlapao testified that because of Werle's inability to successfully complete the FST, he placed Werle under arrest for OVUII, and as a result of discovering that Werle did not have a valid driver's license, he also placed Werle under arrest for OVLSR.
Officer Manlapao transported Werle to the Wailuku Police Station. Once Werle was in the police station, Officer Manlapao read an implied consent form aloud to Werle. Werle elected to take a blood, rather than a breath test. A registered nurse was called to the police station, and the nurse drew a sample of Werle's blood. The nurse appropriately labeled the two tubes of Werle's blood, placed security tapes over the stoppers in the tubes, put the tubes in a sealed laboratory bag, and then placed the bag in a locked refrigerator used to store evidence at the Wailuku Police Station. The laboratory bag was labeled for transport to Maui Memorial Medical Center (MMMC).
Wade Hiraga (Hiraga), a licensed medical technologist at MMMC, testified that he received Werle's blood samples on June 14, 2006. Hiraga stated that if he had observed any discrepancy in the documentation or tamper-proof seals, he would have noted it on the blood extraction form.
Jon Tsuchida (Tsuchida), a licensed medical technologist, testified that on June 15, 2006, he was employed by Clinical Laboratories of Hawaii (CLH). On that date, pursuant to his duties, he took possession of Werle's blood samples for the purpose of testing. Tsuchida described his training and experience in the field of testing blood for alcohol content. Over the defense's objection, the district court qualified Tsuchida as an expert to testify regarding the results of the chemical blood analysis for alcohol content.
Tsuchida testified that he took a tube of Werle's blood to test and the seal on the tube was not leaking nor did it show any signs of having been tampered with. Tsuchida outlined his training and experience in the use and calibration of the Abbott Axiom[3] device he used to test Werle's blood sample (the Axiom). Tsuchida explained how the alcohol content of Werle's blood sample fell outside the maximum range of the Axiom and therefore he had to perform a dilution test. By performing a one-to-one dilution test, Tsuchida determined that the blood alcohol level of Werle's blood sample was 0.370 grams of ethanol per 100 milliliters of whole blood. Tsuchida testified that .08 grams of ethanol per 100 milliliters of whole blood was the legal limit.
Dr. Wong, the toxicology lab director at CLH, described the testing procedures CLH used to test blood samples sent to his lab. He testified that the tests were administered in accordance with Hawaii Administrative Rules (HAR) § 11-114, pertaining to the testing of blood, breath, and other bodily substances for alcohol concentration. The State introduced into evidence a letter from the State of Hawai`i Department of Health (DOH) that designated CLH personnel, including Dr. Wong and Tsuchida, as certified to conduct blood alcohol analyses at CLH in accordance with HAR § 11-114-20 based on CLH's fulfillment of the requirements of HAR § 11-114-18(b).
The State also introduced into evidence a Substance Abuse Testing Laboratory License issued to CLH by DOH, certifying CLH to conduct substance abuse testing in Hawai`i.
On July 12, 2007, the district court entered a judgment of guilty as to Count One, OVUII, and not guilty as to Count Two, OVLSR. Werle timely filed his Notice of Appeal.

II. STANDARDS OF REVIEW

A. Sufficiency of Evidence
The standard of review on appeal for sufficiency of the evidence is substantial evidence.
We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.
"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.
State v. Matavale, 115 Hawai`i 149, 157-58, 166 P.3d 322, 330-31 (2007) (quoting State v. Batson, 73 Haw. 236, 248-49, 831 P.2d 924, 931 (1992)).

B. Plain Error/Rule 52(b)
"Normally, an issue not preserved at trial is deemed to be waived. But where plain errors were committed and substantial rights were affected thereby, the errors may be noticed although they were not brought to the attention of the trial court." State v. Fagaragan, 115 Hawai`i 364, 367-68, 167 P.3d 739, 742-43 (App. 2007) (internal quotation marks, citations, and brackets omitted).

C. Constitutional Questions
"Whether the district court should have dismissed the [OVUII] charge on double jeopardy grounds is a question of constitutional law that we review under the right/wrong standard." State v. Ontiveros, 82 Hawai`i 446, 452, 923 P.2d 388, 394 (1996) (internal quotation marks and citation omitted).

D. Statutory Construction
"The interpretation of a statute is a question of law reviewable de novo." State v. Arceo, 84 Hawai`i 1, 10, 928 P.2d 843, 852 (1996)

Gray v. Admin. Dir. of the Court, 84 Hawai`i 138, 144, 931 P.2d 580, 586 (1997). Furthermore, our statutory construction is guided by established rules:
When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
In construing an ambiguous statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1-15(1) (1993). Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

Gray, 84 Hawai`i at 148, 931 P.2d at 590 (footnote omitted). This court may also consider "the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning." HRS § 1-15(2). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1-16 (1993).

State v. Koch, 107 Hawai`i 215, 220 [], 112 P.3d 69, 74 [] (2005).... Nonetheless, absent an absurd or unjust result, see State v. Haugen, 104 Hawai`i 71, 77, 85 P.3d 178, 184 (2004), this court is bound to give effect to the plain meaning of unambiguous statutory language and may only resort to the use of legislative history when interpreting an ambiguous statute. State v. Valdivia, 95 Hawai`i 465, 472, 24 P.3d 661, 668 (2001).
State v. Rugcfiero, 114 Hawai`i 227, 231-32, 160 P.3d 703, 707-08 (2007) (brackets and ellipses in original omitted).

III. DISCUSSION

A. Reliability of blood alcohol test results
Werle contends the district court erred and violated his rights to due process and a fair trial when the court admitted into evidence the results of the blood alcohol test because the test results were fatally unreliable. Werle claims that various deficiencies in the State's presentation of evidence at trial "raise serious doubts about the reliability of [his] ultimate purported blood alcohol test result."
Werle argues the State did not present evidence from a duly qualified expert that
(1) the "radiative energy attenuation" method (REA) was a "valid technique" for testing blood alcohol levels;
(2) REA had been approved by the DUI[4] Coordinator, as required by HAR § 11-114-22;
(3) the Axiom used a blood alcohol testing procedure approved by the DUI Coordinator;
(4) the "dilution method" Tsuchida employed when analyzing Werle's blood alcohol result (dilution) was reliable; and
(5) the "extrapolation method" Tsuchida applied to the Axiom's blood alcohol reading of the diluted sample (extrapolation) was reliable.
Werle did not raise these arguments below, so we review them for plain error. See Fagaraqan, 115 Hawai`i at 367-68, 167 P.3d at 742-43.

1. Whether the State laid foundation for reliability
"The due process guarantee of a fair trial under the constitutions of both the United States and Hawaii requires that `criminal defendants be afforded a meaningful opportunity to present a complete defense.'" State v. Lowther, 7 Haw. App. 20, 23, 740 P.2d 1017, 1019 (1987) (internal quotation marks and citations omitted).
This court, in State v. Ito, 90 Hawai`i 225, 978 P.2d 191 (App. 1999), stated the following with regard to the admissibility of scientific evidence:
In Hawai`i, the admissibility of scientific or technical evidence is governed by Hawaii Rules of Evidence (HRE) Rules 702 (1993) and 703 (1993), which provide as follows:
Rule 702 Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.
Rule 703 Bases of opinion testimony by experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.
The Hawai`i Supreme Court has held that under HRE Rules 702 (1985) and 703 (1993), the following factors should be considered in determining the admissibility of scientific evidence at trial:
....
3) the underlying theory is generally accepted as valid;
4) the procedures used are generally accepted as reliable if performed properly[.]

State v. Montaibo, 73 Haw. 130, 140, 828 P.2d 1274, 1280-81 (1992).
Id. at 234-35, 978 P.2d at 200-01 (footnote omitted). This court further discussed Montaibo:
In Montaibo, the Hawai`i Supreme Court held that the reliability of scientific evidence depends on three factors: "the validity of the underlying principle, the validity of the technique applying that principle, and the proper application of the technique on the particular occasion." 73 Haw. at 136, 828 P.2d at 1279. The supreme court further explained that "[a]lthough general acceptance in the scientific field is highly probative of the reliability of a scientific procedure, there are other indicators of suitability for admission at trial." 73 Haw. at 138, 828 P. 2d at 1280. In a footnote, the supreme court listed the following factors that the Second Circuit Court of Appeals considered in United States v. Williams, 583 F.2d 1194 (2d Cir. 1978), cert, denied, 439 U.S. 1117, 99 S. Ct. 1025, 59 L. Ed. 2d 77 (1979); and United States v. Jakobetz, 741 F. Supp. 250 (D. Vt. 1990), aff'd, 955 F.2d 786 (2d Cir. 1992), cert, denied, 506 U.S. 834, 113 S. Ct. 104, 121 L. Ed. 2d 63 (1992) (Williams/Jakobetz test), in determining the reliability of a scientific procedure: (1) the potential rate of error, (2) the existence and maintenance of standards, (3) the care with which the scientific technique has been employed and whether it is susceptible to abuse, (4) whether there are analogous relationships with other types of scientific techniques that are routinely admitted into evidence, (5) the presence of failsafe characteristics, (6) the expert's qualifications and stature, (7) the existence of specialized literature, (8) the novelty of the technique and its relationship to more established areas of scientific analysis, (9) whether the technique has been generally accepted by experts in the field, (10) the nature and breadth of the inference adduced, (11) the clarity with which the technique may be explained, (12) the extent to which basic data may be verified by court and jury, (13) the availability of other experts to evaluate the technique, and (14) the probative significance of the evidence. 73 Haw. at 138-39 n.5, 828 P.2d at 1280 n.5.
Ito, 90 Hawai`i at 236-37, 978 P.2d at 202-03.
The burden rests upon the State, prior to the introduction of a test result, to establish a foundation "showing that the test result can be relied on as a substantive fact." State v. Souza, 6 Haw. App. 554, 558, 732 P.2d 253, 256 (1987).
Werle contends the State did not meet the first and second prongs of the Montaibo test, i.e., the State did not meet its burden of demonstrating the validity of REA, the Axiom, dilution, or extrapolation, which were used to test his blood alcohol content. See Ito, 90 Hawai`i at 237, 978 P.2d at 203. The State counters that DOH's issuance of a license update for CLH evidenced DOH's approval of CLH's "underlying techniques" and, by extension, evidenced DOH's approval of CLH's blood alcohol testing methods, including use of REA, the Axiom, dilution, and extrapolation.
At trial, the State submitted into evidence as State's Exhibit 7 an October 12, 2005 letter from DOH to Dr. Wong and CLH (State's Exh. #7), which provided:
This letter constitutes a license update[5] for [CLH] to conduct blood alcohol testing in accordance with [HAR], Title 11, Chapter 114, Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration. This license will expire on November 5, 2006. Licensure is based on having fulfilled requirements of XX-XXX-XX(b).
The following glycolytic inhibition "grey top" tubes are approved for sample collection:
(A) 4cc with approximately 10mg NaF/8mg K Oxalate
(B) 5cc with approximately 12.5mg NaF/10mg K Oxalate
(C) 6cc with approximately 15mg NaF/12mg K Oxalate
(D) 7cc with approximately 17mg NaF/14mg K Oxalate
You are qualified as an Alcohol Testing Supervisor in accordance with XX-XXX-XX. You, Jon Tsuchida, Claudia Nissen, Michael Lau, and Erin Littlejohn are qualified to perform blood alcohol analyses in accordance with XX-XXX-XX.
The State argues that the license update provided the State with a "shortcut" to establishing the validity of CLH's blood alcohol testing method, as required under Montalbo; in other words, by submitting into evidence the license update, the State met its burden of showing the validity of the techniques CLH used to test Werle's blood alcohol content and the principles upon which those techniques were based. The State cites to Lowther in support of its argument.
Lowther involved a DUI trial, in which the State submitted the results of an Intoxilyzer test showing 0.11 percent by weight of alcohol in Lowther's blood. 7 Haw. App. at 21, 740 P. 2d at 1018. At trial, in response to the State's motion to exclude the testimony of an expert witness, Dr. Frajola, the circuit court ruled that Dr. Frajola would not be permitted to testify regarding the reliability of the Intoxilyzer. Id. at 22, 740 P.2d at 1019. However, during his direct examination, the circuit court asked Dr. Frajola to give his opinion regarding the general reliability of the Intoxilyzer. Id. Among other things, Dr. Frajola testified that the Intoxilyzer did not "accurately measure the amount of alcohol in a person's blood." Id. Following an objection by the State, the circuit court struck Dr. Frajola's testimony and instructed the jury to disregard it. Id. at 22-23, 740 P.2d at 1019. The jury found Lowther guilty as charged, and Lowther appealed. Id. at 23, 740 P.2d at 1019.
On appeal, the State argued that the exclusion of the testimony was proper because the Hawai`i Supreme Court had determined in State v. Tencran, 67 Haw. 451, 691 P.2d 365 (1984), that Intoxilyzers are reliable devices. Lowther, 7 Haw. App. at 23, 740 P.2d at 1019. This court stated that the State had misread Tengan:
The issue in Tengan was whether "the use of the Intoxilyzer as a breath-testing device had or had not been authorized by a properly adopted rule." Id. at 454, 691 P.2d at 368. The supreme court held that "the Department of Health approved the use of the Intoxilyzer in accord with the requirements of Chapter 47 of the Public Health Regulations[6] and informed the Director of Transportation," Id. at 461, 691 P.2d at 372, whose letter to the Chief of the Honolulu Police Department "in effect constituted the Director of Transportation's `approval' of a breath test." Id. at 462, 691 P.2d at 373.
One of the foundational prerequisites for the admission of the Intoxilyzer test result into evidence is a "showing that the testing method is reliable." People v. Bowers, 716 P.2d 471, 473 (Colo. 1986). The effect of Tengen is to satisfy the "reliability" prong of the foundational requirements for admissibility. See State v. Souza, 6 Haw. App. 554, 732 P.2d 253 (1987). It relieves the State of the burden of presenting expert testimony regarding the general reliability of the Intoxilyzer as a breath testing device in each DUI prosecution for purposes of admissibility of the test result. Nothing in Tengen suggests that the general reliability of the Intoxilyzer is an unquestioned fact.
Lowther, 7 Haw. App. at 24, 740 P.2d at 1020 (ellipsis, brackets, and footnote in original omitted; footnote added).
In the instant case, the State maintains that in the license update, DOH stated that CLH met the provisions of HAR § 11-114-18(b), and subsection 5 of that rule mandates "that an approved lab `uses blood alcohol testing procedures approved in writing by the DUI coordinator' or `director of health' as required by HAR § 11-114-22." The State further maintains that "[b]y stating that [CLH] satisfied HAR § 11-114-18(b), DOH certified that [CLH] used methods approved in writing by DOH, and the State met its burden of showing DOH's written approval of [CLH's] blood alcohol testing methods."
HAR § 11-114-18 provides in relevant part:
§XX-XXX-XX. Laboratories. (a)... [N]o laboratory shall perform alcohol tests pursuant to this subchapter without an alcohol testing laboratory license issued by the director of health.
(b) A laboratory may qualify for and maintain a license to conduct alcohol testing if the director of health determines that the laboratory has met all of the following requirements:
(1) Is physically located in this State;
(2) Is licensed by the department as a clinical laboratory;
(3) Has adequate facilities, personnel, equipment, and instrumentation;
(4) Includes in its staff an alcohol testing supervisor who is qualified under section 11-114-19;
(5) Uses alcohol testing procedures approved in writing by the DUI coordinator or previously approved by the director of health as required by section 11-114-22 and demonstrates proficiency in those procedures;
(6) Has a quality assurance program approved in writing by the DUI coordinator which includes a chain of custody procedure; and
(7) Participates in and meets the requirements of a performance evaluation program for alcohol testing approved in writing by the DUI coordinator as required by section 11-114-21 at no cost to the department.
(c) A license for a laboratory to perform alcohol tests shall be effective for up to twelve months from the date of issuance.
....
(e) The director of health may revoke the license to perform alcohol testing of any laboratory which fails to conform to the requirements of this subchapter.
(Emphasis added.)
HAR § 11-114-22 provides:
§XX-XXX-XX. Testing procedure approvals. (a) Except as provided in subsection (f), only those blood alcohol testing procedures which have been approved in writing by the DUI coordinator shall be used.
(b) For each blood alcohol testing procedure for which approval is requested the alcohol testing supervisor shall submit to the DUI coordinator for written approval:
(1) A detailed description of the laboratory's blood alcohol testing procedure;
(2) The laboratory's procedural validation data pursuant to subsection (c); and
(3) Pertinent documentation such as scientific literature and manufacturer's specifications.
(c) No blood alcohol testing procedure will be approved unless the following minimum requirements are met:
(1) An alcohol free sample shall produce a result which is less than 0.005 grams alcohol/100 milliliters;
(2) The standard deviation of the procedure shall not exceed 0.005 grams alcohol/100 milliliters at any sample concentration; and
(3) The systematic error shall not exceed plus or minus 0.005 grams alcohol/100 milliliters, or plus or minus five per cent, whichever is greater, of the target value. A minimum of ten measurements of each of three different sample concentrations shall be performed. The samples shall differ by at least 0.04 grams alcohol/100 milliliters in the range of 0.04 to 0.25 grams alcohol/100 milliliters.
(d) Any modification of a previously approved alcohol testing procedure shall be approved by the DUI coordinator in writing before being put into use.
(e) Alcohol testing procedures for post mortem sampling of other bodily substances, as they pertain to this chapter, shall be submitted to the DUI coordinator for written approval.
(f) Procedures approved by the director of health as of the effective date of this chapter shall continue to be approved and remain in effect unless superseded or revoked by the director of health in writing.
In Lowther, this court held that DOH specifically approved the Intoxilyzer as reliable, 7 Haw. App. at 24, 740 P.2d at 1020; whereas, in the instant case, DOH did not specifically approve the use of REA, the Axiom, dilution, or extrapolation. Nevertheless, we believe that Lowther provides strong support for the State's argument that by submitting the license update into evidence at trial, the State fulfilled its requirement to lay a foundation for the reliability of CLH's testing methods.
In addition, notwithstanding Werle's argument to the contrary, the State presented evidence from Dr. Wong regarding the validity of CLH's testing methods. At trial, Dr. Wong testified that CLH was DOH-licensed and had adequate facilities, personnel, equipment, and instruments to properly conduct alcohol testing of blood. He stated that he oversaw general operations at CLH, including alcohol testing operations, and ensured that the machines were properly maintained and records were properly kept and that only properly qualified alcohol analysts conducted alcohol tests. Dr. Wong also ensured that CLH conformed to the requirements of Title 11, Chapter 114 of the HAR. At the time Werle's blood was tested for alcohol content at CLH, Dr. Wong was qualified to be an alcohol testing supervisor at CLH, under HAR § 11-114-19.
Dr. Wong testified that four times a year, CLH underwent a performance evaluation for alcohol testing to determine the accuracy of CLH testing as compared to other laboratories. The test results were given to the College of American Pathologists, who provided evaluations of the results to CLH as well as the DUI coordinator. The DUI coordinator oversaw the results to ensure that CLH's testing had the accuracy required by HAR Chapter 114.
Dr. Wong provided the following testimony regarding the procedure CLH used to analyze blood samples for their alcohol content:
A. [Dr. Wong] The blood specimens are opened only by the licensed technician who breaks the seal, and he is the analyst of record. His job is to run and assemble at the same time a calibration control specimen, a positive control and negative control, and he will take three separate subsamplings of the blood specimen.
Because the sample is  resulted as a whole blood value, the tube must be constantly rotated as a sample takes a small aliquot. The reason is that whole blood is a suspension of the cells as your sample as opposed to plasma, which is taking a liquid after the blood cells settle down.
Whole blood means that you take a sample of everything, the cells in suspension and the  and the liquid material in there. That's why a whole blood value generally is lower than a plasma alcohol because a plasma alcohol value only reads the alcohol that's in the liquid material without the cells.
So we  we  the technician then takes a subsample three times, three separate analyses; that is, he'll run in a single batch with the proper controls, and my job is to ensure that those three individual triplicate runs are within a certain percentage of one another.
And that all the controls that are run at the same time also comply to the accepted ranges. That the negative shows no carryover, and that the calibration check was within 5 percent of the  of the value that it was said to be.
Q. [The State] Okay. Is that testing procedure capable of analyzing an alcohol sample within the range of plus or minus .005 grams of alcohol per hundred milliliters?
[Werle's counsel]: Objection; leading.
[Dr. Wong]: Yes.
Dr. Wong testified that HAR Chapter 114 allowed for a variance on each sample of plus or minus .005 grams of alcohol per hundred milliliters from the mean value of the three samples tested.
The State asked Dr. Wong if he had submitted anything to DOH when requesting approval of CLH's testing procedure. Dr. Wong testified that he had submitted to DOH CLH's standard operating procedures, "a site inspection," and records of CLH's proficiency testing. When the State asked Dr. Wong whether DOH had approved CLH's testing procedures, Werle's counsel objected on the basis that the question was leading, called for hearsay, and lacked a foundation. The State withdrew the question, stating "Your Honor, that's fine. I believe State's Exhibit 7 speaks for itself and so I can withdraw the question."
The State asked Dr. Wong if the toxicology lab of CLH was licensed to conduct blood alcohol testing in accordance with HAR Title 11, Chapter 114, and Dr. Wong responded, "Yes, we are."

2. RKA approval by DUI Coordinator
Werle contends the State presented no evidence from a duly qualified expert that REA had been approved by the DUI coordinator, as required by HAR § 11-114-22; that the Axiom used a blood alcohol testing procedure approved by the DUI coordinator; or that dilution or extrapolation were reliable testing methods.
With regard to the first and second points, as we have already noted, the State's Exhibit #7 provided that DOH's licensure of CLH was based on CLH's having fulfilled the requirements of HAR § 11-114-18(b). That rule provides in relevant part:
§XX-XXX-XX. Laboratories.
....
(b) A laboratory may qualify for and maintain a license to conduct alcohol testing if the director of health determines that the laboratory has met all of the following requirements:
....
(5) Uses alcohol testing procedures approved in writing by the DUI coordinator or previously approved by the director of health as required by section 11-114-22.
(Emphasis added.)
Therefore, the State provided in writing evidence that the DUI coordinator or director of health had approved CLH's use of REA.
With regard to Werle's remaining points, as we have already discussed, the State met its burden of proving the reliability of CLH's testing methods when the State submitted into evidence State's Exhibit #7. See Part III.A.1.

3. Result
The district court did not commit plain error or violate Werle's rights to due process and a fair trial when it admitted into evidence the results of Werle's blood alcohol test.

B. Motion to Dismiss
Werle claims the district court erred when it denied his Motion to Dismiss because prosecution of the offenses was barred under the double jeopardy clause and/or HRS § 701-111.
The double jeopardy clause of the Hawai`i Constitution, article I, section 10, provides that no person shall "be subject for the same offense to be twice put in jeopardy."
HRS § 701-111 provides in relevant part:
§701-111 When prosecution is barred by former prosecution for a different offense. Although a prosecution is for a violation of a different statutory provision or is based on different facts, it is barred by a former prosecution under any of the following circumstances:
(1) The former prosecution resulted in an acquittal which has not subsequently been set aside or in a conviction as defined in section 701-110(3) and the subsequent prosecution is for
(a) Any offense of which the defendant could have been convicted on the first prosecution; or
(b) Any offense for which the defendant should have been tried on the first prosecution under section 701-109 unless the court ordered a separate trial of the offense; or
(c) An offense based on the same conduct, unless:
(i) The offense for which the defendant is subsequently prosecuted requires proof of a fact not required by the former offense and the law defining each of the offenses is intended to prevent a substantially different harm or evil; or
(ii) The second offense was not consummated when the former trial began.

1. "Same conduct" test
Werle argues that under the "same conduct" test put forth in State v. Lessary, 75 Haw. 446, 865 P.2d 150 (1994), he cannot be prosecuted for both OVUII and OVLSR because he "previously suffered fines pursuant to the default judgments entered on the Speeding and White Line offenses." Werle maintains the conduct that formed the basis for the State's Speeding and White Line citations was the same conduct that led to the State's prosecution of him for OVUII and OVSLR.
In Lessary, Lessary was charged with Abuse of a Family or Household Member (Abuse), Unlawful Imprisonment in the First Degree (Unlawful Imprisonment), and Terroristic Threatening in the First Degree (Terroristic Threatening). 75 Haw. at 447-48, 865 P.2d at 151-52. After the Family Court of the Second Circuit found Lessary guilty of Abuse, the Circuit Court of the Second Circuit (circuit court) dismissed the two remaining charges on the ground that prosecution of the charges was
barred as a matter of law by the double jeopardy provisions of the United States and Hawaii Constitutions, as applied under the "single occurrence" test referred to by Justice Scalia in his dissenting opinion in Grady v. Corbin, 495 U.S. 508 [526] 109 L. Ed. 2d 548, 576, 110 S. Ct. 2084, 2096 (1990) and adopted by the Supreme Court of Hawaii in State v. Kipi, 72 Haw. 164, 176 [811 P.2d 815] (1991).
Lessary, 75 Haw. at 450-51, 865 P.2d at 153 (brackets in original). The State appealed from the order dismissing the charges. Id. at 448, 865 P.2d at 152.
The Hawai`i Supreme Court stated that the circuit court's decision was based on a misunderstanding of the supreme court's decision in Kipi, which was in turn based on an interpretation of the United States Constitution that was no longer controlling. Lessary, 75 Haw. at 453, 865 P.2d at 153. The supreme court further stated that under the Hawai`i Constitution,
[t]he [double jeopardy] protections must ensure that individuals are not subjected to multiple prosecutions for a single act. The "same conduct" test set forth by the United States Supreme Court in Grady attempted to provide those protections. The Court there held that
the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted.

Grady, 495 U.S. at 521, 110 S. Ct. at 2093 (footnote omitted).
....
The "same conduct" test as set forth in Grady... protects individuals from multiple prosecutions for the same act without unnecessarily restricting the ability of the State to prosecute individuals who perform separate acts that independently constitute separate offenses. In addition, the "same conduct" test was applied in criminal prosecutions in Hawai`i for the three years that Grady was the applicable law under the United States Constitution. We believe that the application of the Grady rule is necessary to afford adequate double jeopardy protection, and, therefore, we adopt the "same conduct" test under the Hawai`i Constitution.
Id. at 457-59, 865 P.2d at 155-56 (footnotes omitted).
The supreme court then applied the Grady test to the facts in Lessary. Id. at 460, 865 P.2d at 156. The State had conceded that prosecution of the Unlawful Imprisonment charge was barred by the "same conduct" test, and the supreme court analyzed whether the prosecution of the Terroristic Threatening charge was similarly barred. Id. The supreme court held that although the Abuse and Terroristic Threatening charges arose from the "same episode," the Terroristic Threatening charge was not barred because the State argued that to prove the conduct element of that charge, the State would rely on acts independent of the acts that the State alleged in the Abuse charge. Id. at 461, 865 P.2d at 157.
In the instant case, at the hearing on the Motion to Dismiss, the district court denied the motion based on HRS § 291D-3 (Supp. 2006):
The fact in this case that Mr. Werle has allowed two of the citations that he received at the stop back in June of 2006, chose not to contest them  he could have chosen to do it  clearly those matters if he chose to contest them, could not be prosecuted separately. But the fact that he's treated them under the statutory scheme of 701-109 make [sic] an exclusion.
HRS § 291D-3(b) (Supp. 2006) provides that "[i]n no event shall section 701-109 preclude prosecution for a criminal offense where a traffic infraction committed in the same course of conduct has been adjudicated pursuant to this chapter." We believe that HRS § 291D-3(b) addresses the facts in this case more specifically than does Lessary and is, therefore, controlling. See State v. Spencer, 68 Haw. 622, 624, 725 P.2d 799, 800 (1986) (holding that "where there is a `plainly irreconcilable' conflict between a specific statute and a general statute concerning the same subject matter, the specific statute will be favored.").
Moreover, the fines that Werle paid in connection with the citation for the Speeding and White Line infractions do not implicate the double jeopardy clause. See Tauese v. State of Hawai`i, Pep't of Labor & Indus. Relations, 113 Hawai`i 1, 31-33, 147 P.3d 785, 815-17 (2006).

2. HRS Chapter 291D
Werle contends the district court reversibly erred in basing its denial of the Motion to Dismiss on HRS § 291D-3(b) without considering whether to grant the motion pursuant to HRS § 701-111.
Werle based his Motion to Dismiss on HRS § 701-111. In this case, because it more specifically addresses the facts of this case, HRS § 291D-3(b) is controlling. See Spencer, 68 Haw. at 624, 725 P.2d at 800.

3. Result
The district court did not err by denying Werle's Motion to Dismiss.

IV. CONCLUSION
The Judgment filed on July 12, 2007 in the District Court of the Second Circuit, Wailuku Division, is affirmed.
NOTES
[1] The Honorable Eric G. Romanchak presided.
[2] Because the district court found Werle not guilty of OVLSR, that count is not an issue on appeal.
[3] In its Answering Brief, the State asks this court to take judicial notice of what it believes is an error in transcribing the name of the instrument used by CLH to test Werle's blood sample. The State believes the correct name of the instrument referred to throughout the transcript is "Abbot AxSYM." This court will nevertheless refer to the instrument as set forth in the trial transcripts. The precise name of the instrument will not be a factor in the issues presented.
[4] OUVII was formerly known as "DUI," Driving Under the Influence of Intoxicating Liquor, in violation of HRS § 291-4; § 291-4 was repealed in 2000, and § 291E-61 was enacted.
[5] At trial, the circuit court admitted into evidence State's Exhibit #10, a Substance Abuse Testing Laboratory License issued to CLH by DOH, certifying CLH to conduct substance abuse testing in Hawai`i:

Pursuant to Chapter 329B, [HRS], and Title 11, Chapter 113, [HAR], this license is issued to: [CLH]... for substance abuse testing in the State of Hawaii, subject to the following limitations: Test Specimens: Urine; Blood (Alcohol only) [.] Substances Tested and Approved Methodologies[:]
....
Alcohol (specify)... Urine/Blood  ADH Enzyme.
(Formatting altered.)
[6] In Tengen, a letter from DOH to the Department of Transportation provided the following:

In accordance with Public Health Regulations [sic], Chapter 47, approval is granted for the use of the CMI Intoxilyzer (Model 4011AS) as a breath alcohol testing device by the four county police departments.
This device meets the requirements of the National Highway Traffic Administration's Standard for Devices to Measure Breath Alcohol... and is listed as a qualified product by that agency.
67 Haw. at 461 n.14, 691 at 372 n.14.