STATE OF HAWAII, Plaintiff-Appellee, *v.* WAYNE TARO TENGAN, Defendant-Appellant

NO. 9151

(CASE NO. T82-4318)

AND

STATE OF HAWAII, Plaintiff-Appellee, *v.* GLENN ICHIRO AKITA, Defendant-Appellant

NO. 9311

(CASE NO. 1PP OF 7/27/83; T83-765)

NOVEMBER 20, 1984

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

A State agency must follow the Administrative Procedure Act, Hawaii Revised Statutes (HRS) Chapter 91, when it acts in a rule-making capacity. *Town v. Land Use Commission,* 55 Haw. 538, 545, 524 P.2d 84, 89, *reh. denied,* 55 Haw. 677 (1974). In these appeals, Defendants Wayne Taro Tengan and Glenn Ichiro Akita challenge the use of the Intoxilyzer 4011AS (the Intoxilyzer), a breath-testing device, to measure the concentration of alcohol in the blood of suspected drunken drivers on the ground that its use has not been authorized pursuant to a rule adopted in conformity with the Act. Tengan also questions the test results which were admitted as evidence in his case because "the breath test was not conducted by qualified personnel using the proper procedures specified under Hawaii law" and Akita also claims the Director of Transportation improperly delegated part of his authority to a federal agency. Finding no merit in the defendants' contentions, we affirm their convictions of violations of HRS § 291-4.[1]

---

[1] HRS § 291-4 (Supp. 1982) read as follows when defendants were charged thereunder:

Driving under influence of intoxicating liquor. (a) Whoever operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor shall be sentenced as follows without possibility of probation or suspension of sentence:

(1) For a first offense, or any offense not preceded within a four-year

I.

The defendants were stopped by officers of the Honolulu Police Department on suspicion of driving while under the influence of intoxicating liquor in unrelated incidents in 1982 and 1983. Each was arrested and transported to the police station after a roadside sobriety test yielded further evidence of his drunkenness. Apprised that drunk driving suspects who refuse to submit to either a breath or blood test to determine the alcoholic content of their blood are liable to have their driving privileges revoked under the "implied consent" law,[2] each chose to undergo a breath test.

_____

period by a conviction under this section, by:
   (A) A fourteen-hour minimum alcohol abuse rehabilitation program including education and counseling, or other comparable program deemed appropriate by the court; and
   (B) Any two of the following:
      (i) Seventy-two hours of community service work;
      (ii) Thirty-day suspension of license;
      (iii) Forty-eight hours of imprisonment;
   (2) For an offense which occurs within four years of a prior conviction under this section, by any two of the following:
      (A) A fine of not less than $250 but not more than $1,000 or not less than seventy-two hours but not more than one hundred-fifty hours of community service work;
      (B) Ninety-day suspension of license;
      (C) Not less than two days but not more than ten days of imprisonment;
   (3) For an offense which occurs within four years of two prior convictions under this section, by:
      (A) A fine of not less than $500 but not more than $1,000;
      (B) Revocation of license for a period not less than one year but not more than five years; and
      (C) Not less than ten days but not more than one hundred-eighty days imprisonment.
   (b) Notwithstanding any other law to the contrary, whenever a court revokes a person's driver's license pursuant to the provisions of this section, the examiner of drivers shall not grant to such person an application for a new driver's license for such period as specified by the court.
   (c) As used in this section the terms "driver," "driver's license," "examiner of drivers," and "vehicle" shall have the same meanings as provided in section 286-2.

[2] HRS § 286-151 (Supp. 1983) provides that "[a]ny person who operates a motor vehicle on the public highways of the State shall be deemed to have given consent ... to a test approved by the director of transportation of the person's breath or blood for the purpose of determining the alcoholic content of the person's blood."
   A refusal to submit to such testing can result in a revocation of the person's privilege of operating a motor vehicle. *See* HRS § 286-155.

The testing instrument used by the police to verify the concentration of alcohol in the blood of both was the Intoxilyzer. In each case the blood alcohol concentration registered .18% by weight of alcohol, substantially higher than the .10% which then served as presumptive evidence of intoxication under HRS § 291-5.[3]

Prior to trial in the District Court of the First Circuit, Tengan moved to exclude "all evidence obtained by the State in connection with the blood alcohol content breath test," alleging the use of the Intoxilyzer as a breath-testing device had not been authorized by a properly adopted rule. He also urged the court to suppress the evidence on the ground that the pertinent test was conducted by an unqualified person. The district court, however, denied the motion and convicted Tengan of driving under the influence of intoxicating liquor. Akita likewise averred the use of the Intoxilyzer to procure proof of drunkenness in his case had not been approved by the Director of Transportation pursuant to a duly adopted rule and further claimed the director had improperly redelegated his duty in this regard to a federal agency. He sought a dismissal of the

---

[3] At the time of defendants' arrests, HRS § 291-5 (1976) read:

*Evidence of intoxication.* In any criminal prosecution for a violation of section 291-4, the amount of alcohol in the defendant's blood within three hours after the time of the alleged violation as shown by chemical analysis or other approved analytical techniques of the defendant's blood or breath shall be competent evidence that the defendant was under the influence of intoxicating liquor at the time of the alleged violation and shall give rise to the following presumptions:

(1) If there was five-hundredths per cent or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor at the time of the alleged violation.

(2) If there was in excess of five-hundredths per cent but less than ten-hundredths per cent by weight of alcohol in the defendant's blood, such fact may be considered with other competent evidence in determining whether or not the defendant was at the time of the alleged violation under the influence of intoxicating liquor but shall not of itself give rise to any presumption.

(3) If there was ten-hundredths per cent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor at the time of the alleged violation.

The foregoing provisions of this section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question of whether or not the defendant was under the influence of intoxicating liquor at the time of the alleged violation.

Substantial amendments to § 291-5 were enacted in 1983. The statute now makes it unlawful for any person with .10% or more, by weight, of alcohol to operate a vehicle. *See* S.L.H. 1983, vol. 1, c. 117.

charge rather than an order suppressing the evidence. But the district court also rejected his claims of infirmity relating to the approval of the testing device and adjudged him guilty of a violation of HRS § 291-4.

On appeal, the defendants essentially reiterate what was urged upon the district court. Our consideration of the issues posed for decision begins, as it must, with the relevant statutory scheme.

## II.

The genesis of the State's efforts to deter drinkers from driving is traceable to a modest beginning in 1949 with the enactment of S.L.H. 1949, c. 283. Troubled by the prevalence of "accidents and deaths involving persons driving under the influence of liquor" and noting the lack of a "Territorial statute relating to this subject," the Territorial legislature "enact[ed] into law provisions making it a misdemeanor to operate vehicles while under the influence of intoxicating liquor or of drugs." Hse. Stand. Comm. Rep. No. 629, in 1949 House Journal, at 1652.[4] Concomitantly, it "establish[ed] certain [evidentiary] presumptions [relating to a person's intoxicated state] based upon the amount of alcohol in a person's blood." *Id.* Though substantially modified since, the basic proscription of drunk driving and the presumptions enacted by the Territorial legislature remain as part of the statutory scheme to curb drunk drivers. *See* HRS §§ 291-4 and 291-5; *see also* notes 1 and 2 *supra.*

"Implied consent" was added to this scheme in 1967 when the Hawaii Highway Safety Act, now codified as HRS Chapter 286, was passed to comply with a congressional mandate in the Highway Safety Act of 1966, Pub. L. 89-564, § 402(a), 80 Stat. 731, 731 (1966), for states to adopt federally approved highway safety pro-

---

[4] Hse. Stand. Comm. Rep. No. 629 in pertinent part stated:

The purpose of this bill is to enact into law provisions making it a misdemeanor to operate vehicles while under the influence of intoxicating liquor or of drugs, and to establish certain presumptions based upon the amount of alcohol in a person's blood.

Th[e]re is at present no Territorial statute relating to this subject, although there are ordinances under which such drivers are prosecuted. In view of the figures relating to accidents and deaths involving persons driving under the influence of liquor, it is desirable to have a uniform Territorial law in force.

grams. *See* S.L.H. 1967, c. 214, § 2 *and* Sen. Stand. Comm. Rep. No. 234, in 1967 Senate Journal, at 952. Act 214 provided in part that one operating a motor vehicle on the public highways of the State would be deemed to have consented to being tested to determine the amount of alcohol in his blood.[5] It further provided a test could be administered only after a lawful arrest and the suspected drunk driver was informed of the consequences of refusal, which included a possible revocation of driving privileges.[6] Though modified, the essence of these provisions is retained in the calculus of laws dealing with the menacing presence of the intoxicated driver

---

[5] Act 214 in relevant part read:

Sec. ____-160. Implied consent of driver of motor vehicle to submit to testing to determine alcoholic content of blood. Any person who operates a motor vehicle upon the public highways of the State shall be deemed to have given his consent, subject to this part, to a test approved by the highway safety coordinator of his breath or blood for the purpose of determining the alcoholic content of his blood; such person shall have the option to take a test of his breath or blood, or both. The test or tests shall be administered at the request of a police officer having reasonable grounds to believe the person driving or in actual physical control of a motor vehicle upon the public highways is under the influence of intoxicating liquor only after (1) a lawful arrest and (2) the police officer has informed the person of the sanctions of section ____-164.

[6] Act 214 in relevant part read:

Sec. ____-164. Revocation of privilege to drive motor vehicle upon refusal to submit to testing. If a person under arrest refuses to submit to a test of his breath or blood, none shall be given, but the arresting officer shall, as soon as practicable, submit an affidavit to a magistrate of the district in which the arrest was made, stating that at the time of the arrest, he had reasonable grounds to believe the arrested person had either been driving or was in actual physical control of a motor vehicle upon the public highways while under the influence of intoxicating liquor, that the arrested person had been informed of the sanctions of this section, and that the person had refused to submit to a test of his breath or blood.

Upon receipt of the affidavit, the magistrate shall hold a hearing as provided in section ____-165, and shall determine whether the statements contained in the affidavit are true and correct. If the magistrate finds the statements contained in the affidavit are true, he shall revoke the arrested person's license, permit or any nonresident operating privilege for a period of six months.

If the arrested person is a resident without a license or permit to operate a motor vehicle in the State, the magistrate shall send notice of the results of the hearing to the examiners of chauffeurs of all counties. The examiners of chauffeurs shall deny the person the issuance of a license or permit for a period of six months.

The penalties provided by this section are additional penalties and not substitutes for any other penalties provided by law.

on the highways of the State, *see* HRS §§ 286-151 and 286-155, and "implied consent" to testing remains the linchpin of the program to keep him off the highways.

The responsibility of maintaining "scientific and technical control of chemical testing for blood alcohol" subsequently became that of the Department of Health. *See* S.L.H. 1973, c. 139, *and* Sen. Stand. Comm. Rep. No. 692, in 1973 Senate Journal, at 924. The department was assigned the task of "establish[ing] and administer[ing] a statewide program relating to chemical testing of blood-alcohol concentrations for the purposes of chapters 286, Part VII, 291 and 291C, with the consultation of the state highway safety coordinator."[7] S.L.H. 1973, c. 139. It was directed to establish appropriate procedures for specifying:

> (1) The qualifications of personnel who administer chemical tests used to determine blood-alcohol concentrations;
>
> (2) The procedures for specimen selection, collection, handling, and analysis; and
>
> (3) The manner of reporting and tabulation of the results.

*Id.* The director of the department was further empowered to adopt the necessary rules and regulations pursuant to HRS Chapter 91 to implement these provisions. *Id.*

In conformity with the directives of Act 139, now codified as HRS § 321-161, the Director of Health has promulgated comprehensive rules governing the chemical testing of blood, breath and other bodily substances, in accord with HRS Chapter 91.[8] Initially the rules were compiled in Chapter 47 of the Public Health Regulations. But Chapter 47 has since been repealed and the applicable rules are now found in Title 11, Chapter 111, [of the State's] Administrative Rules.

---

[7] The Director of Transportation has assumed the functions of the state highway safety coordinator. *See* S.L.H. 1977, 1st Spec. Sess., c. 20, § 12.

[8] The record indicates rules entitled Department of Health, Title 11, Chapter 111, *Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration,* (Administrative Rules) were adopted by the Director of Health on October 30, 1981 and approved by the Governor on November 15, 1981.

The defendants do not question the validity of these rules. In fact, Tengan's claim of procedural infirmity rests in part on an allegation that the operator of the testing device was not a qualified operator under the rules promulgated by the Director of Health.

Thus, the history of the State's efforts to curb drunk driving has been one of amendments and accretions to the simply worded statutory provisions enacted in 1949. And while the primary duty of enforcing HRS § 291-4 has always rested with the police, the responsibility of implementing the expanded State program is now shared among several state and county agencies taking direction from several chapters of the Hawaii Revised Statutes, as well as from duly adopted rules and regulations.

### III.

The focus of the defendants' challenge of the use of the Intoxilyzer by the police to obtain evidence of intoxication is the language of HRS § 286-151 stating that anyone "who operates a motor vehicle on the public highways of the State shall be deemed to have given consent . . . to *a test approved by the director of transportation* [to determine] the alcoholic content of the person's blood." (Emphasis supplied). They assert the director was obliged thereunder to approve the testing instrument in accord with the rule-making provisions of the Administrative Procedure Act. Since he has not done so, they maintain the evidence of intoxication obtained through the use of the Intoxilyzer was fatally tainted.

### A.

Reading the section in isolation, the defendants would have us rule a "test" within the meaning of § 286-151 encompasses a "testing device" and its approval by the Director of Transportation is subject to the strictures of HRS Chapter 91. "But a statutory provision seldom may be read in isolation," *State v. Raitz,* 63 Haw. 64, 71, 621 P.2d 352, 358 (1980); for "[s]tatutory language must be read in the context of the entire statute and construed in a manner consistent with the purposes of the statutes." *Pacific Insurance Co. v. Oregon Automobile Insurance Co.,* 53 Haw. 208, 212, 490 P.2d 899, 902 (1971) (citations omitted); *see also State v. Kaneakua,* 61 Haw. 136, 140, 597 P.2d 590, 592 (1979). And when we read "test approved by the director of transportation" in historical context with the purposes of the relevant statutes in mind, we can only conclude the approval by the Director of Transportation of the use of the Intoxi-

lyzer in chemical testing for blood alcohol was not subject to the rule-making procedures of the Administrative Procedure Act.

This is not to say the Act does not apply to the adoption of testing procedures for detecting alcohol in the blood of drunk driving suspects; nor do we mean to suggest an agency is free to approve a testing instrument at its whim or fancy. "[E]ach agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy" is a "rule" within the meaning of HRS § 91-1(4), and the agency issuing the statement is bound by the procedural requisites of HRS § 91-3.

We entertain no doubt that when an agency prescribes testing procedures to be employed in determining blood alcohol concentration, it is acting in a rule-making capacity. But we think the primary responsibility for implementing, interpreting, or prescribing law or policy in the area of our present concern, including the prescription of procedures and standards to ensure accurate testing results, has been delegated to an agency other than the Department of Transportation. This conclusion is inescapable when the relevant statutory provisions are viewed in perspective and construed in a manner consistent with their purposes.

### B.

As we have seen, consent implied from the operation of a motor vehicle to "a test approved by the highway safety coordinator (director of transportation)" has been an integral part of the legislative program to discourage drinkers from driving since 1967. *See* S.L.H. 1967, c. 214, § 2.[9] Yet the task of exercising scientific and technical control over chemical testing for blood alcohol was not expressly delegated to an agency until 1973. *See* S.L.H. 1973, c. 139. Finding an absence of actual controls despite the presence of statutory language that could have been read as a grant of authority to the highway safety coordinator, the legislature then "designate[d] the Department of Health as the statewide administrator for the scientific and technical control of chemical testing for blood

---

[9] When S.L.H. 1967, c. 214, was passed, the highway safety coordinator was the State officer with ostensible authority to approve tests. The coordinator's functions were assumed by the Director of Transportation in 1977. *See supra* note 7.

alcohol." Sen. Stand. Comm. Rep. No. 692, *supra*.[10]

Act 139, as we observed, called for the establishment and administration of a statewide chemical testing program to meet the needs engendered by highway safety legislation, and the Director of Health was vested with authority to set the necessary procedures and standards by rules and regulations adopted pursuant to HRS Chapter 91. *See* S.L.H. 1973, c. 139. The comprehensive rules now compiled in Title 11, Chapter 111 of the State's Administrative Rules clearly fulfill the mandate for the establishment of a statewide program under the aegis of the Director of Health, as Chapter 47 of the Public Health Regulations did prior to its repeal.

The duly adopted rules provide for the approval of all breath testing instruments by the Director of Health[11] and impose a duty on the Department of Health to evaluate instruments at the request of manufacturers or other agencies.[12] The performance standards

---

[10] Senate Standing Committee Report No. 692, the Senate committee report accompanying H.B. No. 157, which was enacted into law as S.L.H. 1973, c. 139, stated in part:

The purpose of this bill is to designate the Department of Health as the statewide administrator for the scientific and technical control of chemical testing for blood alcohol.

So designating a State agency has been encouraged by the State Department of Transportation as a result of recommendations set forth by the National Highway Traffic Safety Administration. Although it is noted that breath and blood tests are currently being administered by the County Police Departments, no such controls are prevalent with regard to chemical testing for blood alcohol.

The Department of Health has offered testimony that they stand ready to undertake this responsibility within it's [sic] existing resources.

[11] Section 11-111-2(a) of the Administrative Rules reads in part:

(a) All breath testing instruments and related accessories used for the determination of equivalent blood alcohol content from a person's breath sample shall be approved by the director of health . . . .

[12] Section 11-111-2(a)(8) and (9) of the Administrative Rules read:

(8) It shall be [the] responsibility of the manufacturer or the agency requesting the evaluation of a breath testing instrument for approval to provide the department with the instrument and related accessories; chemical reagents; detailed set of instructions pertaining to the operation, calibration, and maintenance; interpretation of results; and any other material needed for the evaluation; and shall provide the department with such technical consultation as is necessary during the evaluation.

(9) It shall be the responsibility of the department to evaluate the instruments as recommended in §11-111-2 (a), (3), (4) and (5) of this subsection.

for the instruments are also specified therein.[13] Chapter 47 of the Public Health Regulations, which were superseded by Title 11, Chapter 111 of the Administrative Rules, contained provisions of similar import. Under the circumstances, we can only conclude the demands of the rule-making provisions of HRS Chapter 91 relative to chemical testing for blood alcohol under the State's highway safety program have been satisfied. And the record discloses the Director of Health approved the use of the Intoxilyzer in accord with the requirements of Chapter 47 and informed the Director of Transportation of the approval on December 16, 1980.[14]

## C.

This information was communicated in turn to the Chief of the Honolulu Police Department by the Director of Transportation, his letter stating,

[i]n accordance with the Highway Safety Coordinator of the State of Hawaii's "An Agency Statement Concerning the Test-

---

[13] Section 11-111-2(a)(4) and (5) of the Administrative Rules read:

(4) The instruments and their related accessories shall be capable of analyzing a suitable reference sample, such as air equilibrated with a reference solution of known alcohol concentration at a known temperature within the range of one hundredths to thirty hundredths percent weight per volume (0.01% to 0.30% W/V) or higher known alcohol concentrations that are recommended by the breath testing instrument's manufacturer. The results of such analysis must agree with the reference sample value within the limits of plus or minus one hundredths percent weight per volume (±0.01% W/V) or other such limits set by the director.

(5) The instruments and their related accessories shall be capable of analyzing an alcohol-free person which results in a concentration less than one hundredths percent weight per volume (0.01% W/V).

[14] The memorandum read:

In accordance with Public Health Regualtions [sic], Chapter 47, approval is granted for the use of the CMI Intoxilyzer (Model 4011AS) as a breath alcohol testing device by the four county police departments.

This device meets the requirements of the National Highway Traffic Administration's Standard for Devices to Measure Breath Alcohol (39 FR 30459) and is listed as a qualified product by that agency (44 FR 32781).

Memorandum from George Yuen, Director of Health, to Ryokichi Higashionna, Director of Transportation (Dec. 16, 1980). The reference to "Public Health Regulations, Chapter 47," is to the regulations superseded by Chapter 111 of Title 11 and upon which the later regulations are substantially based. Neither Chapter 47 nor Title 11, Chapter 111 is challenged by Tengan or Akita.

ing of Blood and Breath Samples to Determine the Alcoholic Content Thereof" Part II A and C, the enclosed Department of Health statement of approval of the CMI Intoxilyzer breath alcohol testing device is provided for your records.

Letter from Ryokichi Higashionna to Francis Keala (Jan. 23, 1981). The reference to an agency statement was to an earlier document issued by the Highway Safety Coordinator, which in relevant part provided:

A. *THE TEST APPARATUS*

The apparatus to be used in the approved test of breath samples to determine the alcoholic content of the blood of a person tested shall be one which qualifies for the National Highway Traffic Safety Administration Qualified Products List of Evidential Breath Testers for Alcohol Content under the Federal Standard for Devices to Measure Breath Alcohol (38 F. R. 30459 November 5, 1973 or any subsequent revision thereof).

Hawaii Highway Safety Coordinator, *An Agency Statement Concerning the Testing of Blood and Breath Samples to Determine the Alcoholic Content Thereof* pt. II(A) (1976). The letter of January 23, 1981 thus served as notice to the Chief of Police that the use of the Intoxilyzer had been approved by the Director of Health and it met the Federal Standard for Devices to Measure Breath Alcohol. In effect, the letter constituted the Director of Transportation's "approval" of a breath test following the testing procedures outlined in Title 11, Chapter 111 and employing an instrument approved for use by the Director of Health, which was also on the National Highway Traffic Safety Administration's Qualified Products List.[15]

The Director of Transportation's approval of the use of the Intoxilyzer could hardly be deemed rule making. For he set no policy and exercised no discretion with respect to the use of testing instruments; he merely coordinated State and federal efforts to maintain accuracy in chemical testing for blood alcohol. We would

---

[15] State and local governments using federal funds available under section 402(a) of the Highway Safety Act of 1966 to acquire evidential breath testing devices can only purchase equipment on the National Highway Traffic Safety Administration Qualified Product List. *See* 38 Fed. Reg. 30459-60 (1973).

characterize his approval of tests pursuant to HRS § 286-151 as a ministerial rather than a quasi-legislative function. The implementation, interpretation, or prescription of law or policy in the particular area is clearly the province of the Director of Health, and he has promulgated the rules governing the use of chemical testing instruments in the enforcement of highway safety laws.[16]

## IV.

Turning to the remaining issues raised by the defendants, we first address Akita's contention that an impermissible delegation of legislative authority occurred when the Director of Transportation issued "An Agency Statement Concerning the Testing of Blood and Breath Samples to Determine the Alcoholic Content Thereof" in 1976.[17] The statement in question declared that the apparatus used in testing breath samples had to be on the Qualified Products List of the National Highway Traffic Safety Administration "or any subsequent revision thereof." This reference to subsequent revisions, Akita urges, resulted in the adoption by the State of future changes in federal law or policy. We find no merit in the proposition.

To be sure, the Intoxilyzer was not on the Qualified Products List in 1976; it was deemed fit for use in breath testing by the federal agency in 1979. We are mindful too that "state legislation which adopts by reference *future* legislation, rules, or regulations, or amendments thereof, which are enacted, adopted, or promulgated by another sovereign entity, [would constitute] an unlawful delegation of legislative power." *People v. Urban,* 45 Mich. App. 255, 262, 206 N.W.2d 511, 516 (1973) (citations omitted) (emphasis in original). But here, we earlier concluded the legislature did not contemplate that the Director of Transportation would be acting in

---

[16] We also do not view the approval of the Intoxilyzer by the Director of Health as rule making. Approval here merely entailed the measurement of performance against set standards prescribed earlier in accord with the Administrative Procedure Act, and the Director exercised no discretion and issued no policy statement when he approved the particular instrument.

[17] The document in question is the agency statement we discussed in the preceding part of this opinion.

a quasi-legislative capacity where chemical testing for blood alcohol was concerned. Hence, he could not have adopted federal legislation, rules, or regulations, "or any subsequent revision thereof."

## V.

The last issue posed for decision is whether the evidence of Tengan's intoxication obtained through the use of the Intoxilyzer was admissible at trial. The test in question, Tengan would have us hold, "was not conducted by qualified personnel using the proper procedures specified under Hawaii law." He further asserts the Honolulu Police Department's maintenance of the particular testing instrument was not up to the standards set by the Director of Health.[18] These technical shortcomings, he claims, rendered the test unreliable and the results inadmissible.

---

[18] Ironically, he relies on the rules promulgated by the Director of Health in claiming the test results were inadmissible.

The qualifications required of an operator of breath testing instruments are delineated at § 11-111-4 of the Administrative Rules, which reads in part:

*Operator of breath testing instruments.* An operator of breath testing instruments shall be responsible for the proper performance of analysis of breath samples, proper record keeping, and proper reporting of results.

(1) Any person employed by a county police department, may qualify as an operator by:

(A) Having successfully completed training as specified in this section approved by the department; or

(B) On the effective date of this chapter have not less than one (1) year's experience in the operation of the approved breath testing instrument to be utilized; or

(C) Being able to exhibit through examination and demonstration or both to the department sufficient skill in the operation and interpretation of results of the approved testing instrument to be utilized.

The testing procedures to be utilized are also specified in § 11-111-2. Some of the procedural safeguards the operator is expected to observe are:

(7) In addition to those recommended by the manufacturers [of the instrument], there shall be the following procedural safeguards:

(A) Continuing observation of the subject for a minimum of fifteen (15) minutes prior to collection of the breath sample, during which period the subject shall not have ingested alcohol or vomited [sic]. If the subject vomits, wait fifteen (15) minutes before collecting the breath sample.

(B) The temperature of the instrument is stable.

(C) A system of blank analysis, if recommended by the manufacturer.

We have reviewed the testimony of the operator of the instrument and that of her operator/supervisor and weighed the uncontroverted evidence relating to her qualifications, the procedures utilized by her, and the department's maintenance of its Intoxilyzer against the qualifications, procedures, and standards prescribed by the Director of Health. We find no basis in the record for holding the test administered to Tengan was deficient in any respect.

The judgments of the District Court of the First Circuit are affirmed.

*Gregory K. Tanaka,* Deputy Public Defender, for Appellant Tengan.

*Lynn L. Hodgson (Arthur E. Ross* on the brief), Deputy Prosecuting Attorneys, for Appellee State of Hawaii.

*Charles S. Gerdes* on the briefs for Appellant Akita.

*Lynn L. Hodgson,* Deputy Prosecuting Attorney, on the brief for Appellee State of Hawaii.

---

(D) Analysis of a suitable reference sample of known alcohol concentration. The results of such analysis must agree with the reference sample value within the limits of plus or minus one hundredths percent weight per volume (±0.01% W/V) or such limits as set by the director.

(E) The lot or value number of the reference sample used shall be noted.

The maintenance standards are set out at § 11-111-2(b), which provides in part:

(b) Testing for accuracy, maintenance and repair of all breath testing instruments and related accessories employed pursuant to this chapter shall comply with the following:

(1) It shall be the responsibility of the operator/supervisor to assure that testing for accuracy is done.

(2) Only methods recommended by the manufacturers or approved by the department for the testing for accuracy shall be employed.

(3) Testing for accuracy shall be done no less frequently than every thirty (30) days and after every maintenance and repair using a minimum of two (2) reference samples of known alcohol concentrations at a known temperature within the range of one hundredths to thirty hundredths percent weight per volume (0.01% to 0.30% W/V) or higher known alcohol concentrations that are recommended by the breath testing instrument's manufacturer. The results of such analysis must agree with the reference sample value within the limits of plus or minus one hundredths percent weight per volume (±0.01% W/V) or such limits set by the director.