218 P.3d 762

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**William Edward WERLE, Petitioner/Defendant–Appellant.**

**No. 28653.**

Supreme Court of Hawai'i.

Nov. 3, 2009.

Phyllis J. Hironaka, Deputy Public Defender, for petitioner/defendant-appellant.

Justine Hura, Deputy Prosecuting Attorney, County of Maui, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ. and Circuit Judge CHAN, in place of RECKTENWALD, J., recused.

Opinion of the Court by DUFFY, J.

On July 29, 2009, this court accepted a timely application for a writ of certiorari filed on June 22, 2009 by petitioner/defendant-appellant William Edward Werle (Werle) seeking review of the March 25, 2009 judgment of the Intermediate Court of Appeals (ICA) based on its March 11, 2009 Memorandum Opinion (Mem.Op.) in *State v. Werle,* No. 28653, 2009 WL 633079 (App.2009). The ICA's Mem. Op. affirmed the July 12, 2007 judgment of conviction and sentence of the district court of the second circuit[1] (district court) for Operating a Vehicle Under the Influence of an Intoxicant (OVUII), in violation of Hawai'i Revised Statutes (HRS) § 291E-61(a) and/or (d) (Supp.2006).

In his Application, Werle presents the following question: "Whether the ICA gravely erred, in violation of Werle's rights to due process and fair trial, by affirming the trial court's admission into evidence of his purported blood alcohol test result, despite five evidentiary foundational defects." Oral argument was held on September 3, 2009.

The "five foundational defects" alleged by Werle are that

the State did not present evidence from a duly qualified expert that

(1) the "radiative energy attenuation" method (REA) was a "valid technique" for testing blood alcohol levels;

(2) [the] REA had been approved by the DUI Coordinator, as required by HAR § 11-114-22;

(3) the [Abbott AxSYM][2] used a blood alcohol testing procedure approved by the DUI Coordinator;

---

1. The Honorable Eric G. Romanchak presided.

2. The trial transcript identified the testing instrument used to perform Werle's blood alcohol test as the "Axiom." In its Answering Brief, the prosecution asked the ICA to take judicial notice that the testing instrument was actually called the "Abbott AxSYM." The ICA declined to take judicial notice of the spelling of the testing instrument and chose to use the spelling in the trial

transcripts because "[t]he precise name of the instrument will not be a factor in the issues presented." ICA's Mem. Op. at 4 n. 3. For the sake of accuracy, we take judicial notice of the actual spelling of the testing instrument. *See* Hawai'i Rules of Evidence (HRE) Rule 201(c), (f) (1993) (providing that judicial notice may be taken of facts "capable of accurate and ready determination by resort to sources whose accura-

(4) the "dilution method" [the medical technician] employed when analyzing Werle's blood alcohol result (dilution) was reliable; and

(5) the "extrapolation method" [the lab technician] applied to the [Abbott AxSYM]'s blood alcohol reading of the diluted sample (extrapolation) was reliable.[3]

Based on the following, we agree with Werle that there was an insufficient foundation laid for admission into evidence of his blood alcohol test result. Accordingly, we reverse Werle's conviction for OVUII.

## I. BACKGROUND

### A. Factual Background

The ICA summarized the relevant factual background as follows:

On June 6, 2006, Werle was operating a motor vehicle on South Kihei Road when Officer Manlapao observed Werle exceeding the posted speed limit, in violation of HRS § 291C–102 (Supp.2005). Officer Manlapao also observed Werle disregard a single solid white line, in violation of HRS § 291C–38 (2007 Repl). Officer Manlapao stopped Werle, subsequently arrested Werle for OVUII and OVLSR, and issued a citation to Werle for Speeding and Disregarding a Single Solid White Line (White Line).

Werle posted bail on the OVUII and OVLSR charges and was given a court appearance date of August 3, 2006. Werle was not given an appearance date for the citation. Werle did not contest the citation, and on July 14, 2006, he paid $214.00 in fines for the Speeding and White Line infractions.

ICA's Mem. Op. at 2.

On July 14, 2006, the State of Hawai'i filed a complaint charging Werle with OVUII, in violation of HRS § 291E–61(a)[4] and/or (d)[5] (Supp.2006).[6]

### B. Trial Proceedings

As explained by the ICA,

At trial, Officer Manlapao testified that after stopping Werle, he approached the driver's side of the vehicle and asked for Werle's driver's license, registration, and

---

cy cannot reasonably be questioned" and that "[a] court may take judicial notice, whether requested or not ... at any stage of the proceeding.").

3. In this opinion, we focus on the REA testing procedure and the Abbott AxSYM testing instrument because it appears from the testimony that the "dilution method" and the "extrapolation method" are applications of the REA testing procedure that are read after analysis by the Abbott AxSYM testing instrument.

4. At the time the complaint was filed, HRS § 291E–61(a) stated in relevant part:

(a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:
(1) While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty;
(2) While under the influence of any drug that impairs the person's ability to operate the vehicle in a careful and prudent manner;
(3) With .08 or more grams of alcohol per two hundred ten liters of breath; or
(4) With .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood.

HRS § 291E–61(a) (Supp.2006). Subsequent amendments to HRS § 291E–61 have not altered the relevant text in subsection (a).

5. HRS § 291E–61(d) states that

Whenever a court sentences a person *pursuant to subsection (b)*, it also shall require that the offender be referred to the driver's education program for an assessment, by a certified substance abuse counselor, of the offender's substance abuse or dependence and the need for appropriate treatment. The counselor shall submit a report with recommendations to the court. The court shall require the offender to obtain appropriate treatment if the counselor's assessment establishes the offender's substance abuse or dependence. All costs for assessment and treatment shall be borne by the offender. HRS § 291E–61(d) (Supp.2006) (emphasis added). As Werle was not charged with HRS § 291E–61(b), it is not clear why HRS § 291E–61(d) was charged.

6. Werle was also charged with Operating a Vehicle After License and Privilege have been Suspended or Revoked for Operating a Vehicle Under the Influence of an Intoxicant (OVLSR), HRS § 291E–62 (2007). The district court found him not guilty of this charge on July 12, 2007.

proof of insurance. As he received the requested paperwork, Officer Manlapao detected the odor of liquor on Werle's breath. Officer Manlapao returned to his police vehicle to verify Werle's documentation. While Officer Manlapao was checking the documents, contrary to Officer Manlapao's instructions, Werle exited his vehicle. Officer Manlapao saw that Werle had difficulty walking straight and appeared to be staggering. Officer Manlapao asked Werle if he would participate in a field sobriety test (FST), and Werle agreed. Officer Manlapao testified that because of Werle's inability to successfully complete the FST, he placed Werle under arrest for OVUII, and as a result of discovering that Werle did not have a valid driver's license, he also placed Werle under arrest for OVLSR.

Officer Manlapao transported Werle to the Wailuku Police Station. Once Werle was in the police station, Officer Manlapao read an implied consent form aloud to Werle. Werle elected to take a blood, rather than a breath test. A registered nurse was called to the police station, and the nurse drew a sample of Werle's blood. The nurse appropriately labeled the two tubes of Werle's blood, placed security tapes over the stoppers in the tubes, put the tubes in a sealed laboratory bag, and then placed the bag in a locked refrigerator used to store evidence at the Wailuku Police Station. The laboratory bag was labeled for transport to Maui Memorial Medical Center (MMMC).

Wade Hiraga (Hiraga), a licensed medical technologist at MMMC, testified that he received Werle's blood samples on June 14, 2006. Hiraga stated that if he had observed any discrepancy in the documentation or tamper-proof seals, he would have noted it on the blood extraction form.

Jon Tsuchida (Tsuchida), a licensed medical technologist, testified that on June 15, 2006, he was employed by Clinical Laboratories of Hawaii (CLH). On that date, pursuant to his duties, he took possession of Werle's blood samples for the purpose of testing. Tsuchida described his training and experience in the field of testing blood for alcohol content. Over the defense's objection, the district court qualified Tsuchida as an expert to testify regarding the results of the chemical blood analysis for alcohol content.

Tsuchida testified that he took a tube of Werle's blood to test and the seal on the tube was not leaking nor did it show any signs of having been tampered with. Tsuchida outlined his training and experience in the use and calibration of the [Abbott AxSYM] device he used to test Werle's blood sample. . . . Tsuchida explained how the alcohol content of Werle's blood sample fell outside the maximum range of the [Abbott AxSYM] and therefore he had to perform a dilution test. By performing a one-to-one dilution test, Tsuchida determined that the blood alcohol level of Werle's blood sample was 0.370 grams of ethanol per 100 milliliters of whole blood. Tsuchida testified that .08 grams of ethanol per 100 milliliters of whole blood was the legal limit.

ICA's Mem. Op. at 3–5 (footnote omitted).

Tsuchida testified that the CLH lab used the radiative energy attenuation method (REA)—an enzymatic reaction—to test Werle's blood. The "enzymatic method" was apparently based on "Beer's Law," which Tsuchida had learned in school. Tsuchida described Beer's law as a scientific method whereby "you put standard on the machine and it will plot a curve for you in relation to the concentration [of a substance] and time. And in the color change, as it goes along, you can plot it; and you can find out what the concentration of a substance is." When performing an REA test, the alcohol in the blood will be mixed with the ADH enzyme and the more alcohol present "the more intense the color change." According to Tsuchida, CLH had been using the REA method since 1999. Significantly, Tsuchida did not testify to the general reliability and acceptance of the REA test.

The testing instrument machine that CLH used to conduct the REA test was called the Abbott AxSYM. At the time of the trial, CLH had been using the Abbott AxSYM for "two or three years." Prior to that, CLH had used a testing instrument called the

"TDX." According to Tsuchida, the main difference between the Abbott AxSYM and the TDX was that the Abbott AxSYM was "a more automated machine." Tsuchida testified that "[a]lthough the machine has changed the [scientific] principle has remained the same." Again, significantly, Tsuchida did not testify to the validity of the scientific principles underlying the Abbott AxSYM as a testing instrument for the REA procedure.

Clifford Wong, Ph.D., the Toxicology Lab Director of CLH, also testified. Dr. Wong, whose Ph.D. is in biochemistry, was qualified as an expert in the field of toxicology. He stated that CLH was licensed by the State of Hawai'i Department of Health (DOH) as a clinical laboratory. Dr. Wong further testified that he was the Alcohol Testing Supervisor[7] for CLH and in that capacity he ensured that CLH complied with the requirements of Hawai'i Administrative Rules (HAR) Title 11 Subsection 114, titled Testing of Blood, Breath, and Other Bodily Substances for Alcohol Concentration. In order to comply with the HAR requirements, Dr. Wong supervised a "quality assurance program" which involved procedures to ensure that the blood alcohol test results were accurate. Again, significantly, Dr. Wong was not specifically questioned about the REA chemical testing procedure or the Abbott AxSYM testing instrument.

With respect to whether the REA chemical testing procedure or the Abbott AxSYM testing instrument were approved by the DOH, when the prosecution attempted to ask Dr. Wong if CLH's "testing procedures" were approved by the DOH, the district court sustained Werle's objection that the question "call[ed] for hearsay and lack of confrontation." Later, the prosecution asked Dr. Wong what documents were submitted to the DOH to obtain written approval for testing procedures. As a followup question, the

prosecution asked if CLH's blood alcohol testing procedures were approved by the DOH. After Werle objected, the prosecution stated "Your honor, that's fine. I believe State's Exhibit 7 [the letter from the DOH to Dr. Wong updating CLH's license to conduct blood alcohol testing] speaks for itself and so I withdraw the question." As a result, there was no admissible testimony by Dr. Wong that the DOH approved CLH's testing procedures in general or, specifically, the REA chemical testing procedure and the Abbott AxSYM testing instrument.

The prosecution introduced into evidence a letter from the DOH that constituted "a license update for the Toxicology Lab of Clinical Laboratories of Hawaii to conduct blood alcohol testing." The letter—which was in effect at the time Werle's blood was tested—stated that the CLH toxicology lab was licensed by the DOH "to conduct blood alcohol testing in accordance with Hawaii Administrative Rules, Title 11, Chapter 114, Testing of Blood, Breath, and Other Bodily Substances for Alcohol Concentration."

The prosecution also submitted a copy of CLH's Substance Abuse Testing Laboratory License that was in effect at the time Werle's blood was tested. The license stated in relevant part that CLH was licensed to test blood alcohol in Hawai'i using the "ADH enzyme method." The license did not refer to the REA chemical testing procedure or the use of the Abbott AxSYM testing instrument.

## C. *Motion for a Judgment of Acquittal*

After the prosecution had rested its case, Werle moved to strike "any evidence with respect to any blood alcohol content [test] results" because HAR chapter 114 "had not been complied with." Specifically, Werle argued to the district court that

---

7. Hawai'i Administrative Rules (HAR) § 11–114–19 provides in relevant part that:
 (a) The alcohol testing supervisor shall:
 (1) Be responsible for the validity of all alcohol tests conducted by the laboratory;
 (2) Oversee maintenance and repair of instruments and related accessories;
 (3) Ensure that only properly qualified alcohol analysts conduct alcohol tests;

(4) Ensure that required records are kept;
(5) Closely oversee alcohol testing operations in the laboratory; and
(6) Ensure that the laboratory conforms to the requirements of this subchapter.
HAR § 11–114–19(a) (1993).

[under HAR § 11–114–22,] only those blood alcohol testing procedures which have been approved in writing by the DUI coordinator shall be used.

Where's the evidence, Judge, that Clinical Laboratories of Hawaii utilized [the Abbott AxSYM] they had running the last couple of years or so was approved [sic] in writing by any DUI coordinator? Exhibit 7 doesn't state that. Even if a laboratory is licensed, which the Court has already ruled there's evidence of it, there's no evidence that the procedure used was approved by the DUI coordinator pursuant to [HAR § ]11–114–22.

. . . .

Subsection B [of HAR chapter 114] talks about for each blood alcohol testing procedure for which approval is requested, the alcohol testing supervisor shall submit to the DUI coordinator for written approval of the details.

Now, Judge, all we have is a license.

. . . .

There's been a switch of the machines while the laboratory has been licensed, but there's been no proof that in the switch of the new machine, there has been a written request of the DUI coordinator and a written approval that the DOH, Department of Health, has approved the switch of the machine and the procedure.

The district court denied Werle's motion to strike the blood alcohol content test results.

Werle then moved for a judgment of acquittal:

So I'm just saying that even if [the court does not] buy the argument that there is enough contradictory or insufficient evidence to show that the procedure utilized, in my client's case, was approved, particularly given the change of the blood testing machine, I move for judgment of acquittal because it raises, at least some reasonable doubt, given the lack of real clear compliance with the rules; given [the] technician's testimony that they did the switch [of testing machines to the Abbott Ax-SYM]—arguably during the license was in effect [sic].

The district court denied the motion for acquittal and found Werle guilty of OVUII.

### D. The ICA's Memorandum Opinion

As will be discussed more fully *infra*, the ICA affirmed the district court's final judgment. ICA's Mem. Op. at 22.

## II. STANDARDS OF REVIEW

### A. The Necessity of Laying a Proper Foundation for Introduction of Out–of–Court Test Results Into Evidence

■ "A fundamental rule of evidence is that before the result of a test made out of court may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact." *State v. Souza,* 6 Haw.App. 554, 558, 732 P.2d 253, 256 (1987).

### B. The Admission of Alcohol Testing Results Into Evidence

Referring to the admission of alcohol testing results, this court has stated that "the ultimate question is whether the trial court abused its discretion in admitting the test result into evidence." *State v. Thompson,* 72 Haw. 262, 265, 814 P.2d 393, 395 (1991) (citation omitted).

## III. DISCUSSION

The sole issue in this appeal is evidentiary: Whether the prosecution met its burden to establish a proper foundation for introduction into evidence of Werle's blood alcohol test results. Werle contends that the prosecution failed to present sufficient foundational evidence for either the REA blood alcohol chemical testing procedure or the Abbott AxSYM testing instrument used to perform Werle's blood alcohol test. For the following reasons, we agree with Werle.

### A. Plain Error

■ As a preliminary matter, we agree with Werle that the ICA erred by considering the foundational reliability issue under the standard of plain error review. *See* ICA's Mem. Op. at 18 ("The district court did not commit plain error or violate Werle's rights to due process and a fair trial when it

admitted into evidence the results of Werle's blood alcohol test.").

Plain errors are errors that were not brought to the attention of the trial court. *See* Hawai'i Rules of Penal Procedure Rule 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Here, as discussed in the background section, Werle preserved his foundational objection to the introduction of his blood alcohol test results argument when he made oral motions to strike the evidence and for a judgment of acquittal based on the prosecution's failure to prove a proper foundation showing reliability of the procedure and the testing instrument used to test his blood. Therefore, Werle's appeal should not have been subject to plain error review.

B. *The DOH's Regulation of Blood Alcohol Testing*

The DOH has been delegated the authority to regulate which chemical testing procedures may be used to determine a person's blood alcohol content. HRS § 321–161 provides that:

(a) The department of health shall establish and administer a statewide program relating to chemical testing of alcohol concentrations or drug content for the purposes of chapters 286, 291, 291C, and 291E, with the consultation of the state director of transportation. Under the program, appropriate procedures shall be established for specifying:

(1) The qualifications of personnel who administer chemical tests used to determine alcohol concentrations or drug content;

(2) *The procedures for* specimen selection, collection, handling, and *analysis*; and

(3) The manner of reporting and tabulating the results.

8. The DOH also regulates breath alcohol testing procedures in a separate subchapter of HAR title 11, chapter 114, which is not involved in this case.

9. It is the DOH director's duty to serve as DUI coordinator or to delegate that power to anoth-

(b) The director of health may adopt rules pursuant to chapter 91 necessary for the purposes of this section.

HRS § 321–161 (1993 & Supp.2006) (emphases added). The legislative purpose of HRS § 321–161 was

to designate the Department of Health as the statewide administrator for the *scientific and technical control of chemical testing for blood alcohol.*

So designating a State agency has been encouraged by the State Department of Transportation as a result of recommendations set forth by the National Highway Traffic Safety Administration. Although it is noted that breath and blood tests are currently being administered by the County Police Departments, *no such controls are prevalent with regard to chemical testing for blood alcohol.*

S. Stand. Comm. Rep. No. 692, in 1973 Senate Journal, at 924 (emphases added). Thus, the DOH functions to ensure the uniformity of blood alcohol testing procedures.[8]

The DOH has promulgated rules pertaining to blood alcohol testing, which are codified in HAR title 11, chapter 114, Testing of Blood, Breath, and Other Bodily Substances for Alcohol Concentration. Pursuant to chapter 114, the DOH director is responsible for granting laboratories licenses to perform blood alcohol tests. HAR § 11–114–18 (1993). A laboratory will only qualify for and be permitted to maintain a license if it "[u]ses alcohol testing procedures approved in writing by the DUI coordinator [9] or previously approved by the director of health as required by section 11–114–22 and demonstrates proficiency in those procedures[.]" HAR § 11–114–18(b)(5).

The DUI coordinator is charged with approving blood alcohol testing procedures. HAR § 11–114–22 provides in relevant part that

er. *See* HAR § 11-114-17 (1993) ("'DUI coordinator' means the director of health or the individual(s) authorized by the director of health to represent the director of health in matters pertaining to this chapter.").

(a) Except as provided in subsection (f), only those blood alcohol testing procedures which have been approved in writing by the DUI coordinator shall be used.

(b) For each blood alcohol testing procedure for which approval is requested the alcohol testing supervisor shall submit to the DUI coordinator for written approval:

(1) A detailed description of the laboratory's blood alcohol testing procedure;

(2) The laboratory's procedural validation data pursuant to subsection (c); and

(3) Pertinent documentation such as scientific literature and manufacturer's specifications.

. . . .

(d) Any modification of a previously approved alcohol testing procedure shall be approved by the DUI coordinator in writing before being put into use.

. . . .

(f) Procedures approved by the director of health as of the effective date of this chapter shall continue to be approved and remain in effect unless superseded or revoked by the director of health in writing.

HAR § 11–114–22 (1993).

C. *The Prosecution's Burden and Duties in OVUII cases*

Werle was charged with violation of HRS § 291E–61(a). *See supra*, n. 4. As a result, the prosecution was required to prove beyond a reasonable doubt that Werle was operating a vehicle "[w]ith .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood."

**1. The Prosecution's Duty to Provide Competent Evidence of Blood Alcohol Content.**

 Before introducing test results that prove intoxication, the prosecution must lay a

foundation. *See State v. Souza*, 6 Haw.App. at 558, 732 P.2d at 256 (1987) ("A fundamental rule of evidence is that before the result of a test made out of court may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact."). As part of the foundation, the prosecution must establish the reliability of the test results which establish intoxication. *See State v. Lowther*, 7 Haw.App. 20, 24, 740 P.2d 1017, 1020 (1987) ("One of the foundational prerequisites for the admission of the Intoxilyzer test result into evidence is a showing that the testing method is reliable." (internal quotation marks, brackets, and citation omitted)).[10]

**2. Reliability of a Blood Alcohol Test May Be Established By (1) Demonstrating That the Specific Procedure and Testing Instrument Used Were Approved By the DUI Coordinator or (2) By Expert Testimony.**

Blood alcohol tests are scientific in nature. In Hawai'i, the admissibility of scientific or technical evidence is governed by Hawai'i Rules of Evidence (HRE) Rules 702 (1993) and 703 (1993). We have previously held that under HRE Rules 702 and 703, the following factors must be considered in determining whether the scientific evidence being offered is reliable: "Whether scientific evidence is reliable depends on three factors, the validity of the underlying principle, the validity of the technique applying that principle, and the proper application of the technique on the particular occasion." *State v. Montalbo*, 73 Haw. 130, 136, 828 P.2d 1274, 1279 (1992) (a DNA profiling case). The nature and quality of expert testimony needed to satisfy the *Montalbo* reliability requirement were addressed by this court in *State v. Vliet*:

The reliability requirement refers to *evidentiary* reliability—that is trustworthiness. Under this prong, admission of expert evidence is premised on the assumption that the expert's opinion will

---

10. As has been explained by this court, "[t]he Intoxilyzer is a machine that measures the concentration of alcohol in a breath sample." *State v. Vliet*, 95 Hawai'i 94, 97 n. 3, 19 P.3d 42, 45 n.

3 (2001) (citations and internal quotation marks omitted) (quoting *State v. Ito*, 90 Hawai'i 225, 228 n. 2, 978 P.2d 191, 194 n. 2 (App.1999)).

have a reliable basis in the knowledge and experience of his or her discipline.

95 Hawai'i at 106, 19 P.3d at 54 (citations, brackets and internal quotation marks omitted) (emphasis in original).

■ While acknowledging the reliability requirement of *Montalbo,* the prosecution submits that DOH's approval of a testing procedure and instrument for blood alcohol analysis is a "shortcut" to establishing the reliability required under *Montalbo* as a prerequisite to admissibility of the test results.

We agree with the prosecution, *provided* that the record shows that the DUI coordinator approved the specific blood alcohol testing procedure and instrument, as will now be discussed.

### 3. The Prosecution Has the Burden to Show That the Specific Testing Procedure and Testing Instrument Were Approved By the DUI Coordinator.

Hawai'i law requires that blood alcohol testing procedures whose results are offered to prove intoxication be approved:

(a) In any criminal prosecution for a violation of section 291E–61 . . .

(1) .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of the person's blood

. . . .

within three hours after the time of the alleged violation *as shown by chemical analysis or other approved analytical techniques of the person's blood* . . . shall be competent evidence that the person was under the influence of an intoxicant at the time of the alleged violation.

HRS § 291E–3(a) (Supp.2006) (emphasis added).

HAR § 11–114–22 expressly provides that the "approval" is to be by the DUI coordinator, and that *"only those blood alcohol testing procedures which have been approved in writing by the DUI coordinator shall be used."* HAR § 11–114–22(a) (emphasis added).

### 4. There is No Evidence in the Record That the DUI Coordinator Approved the REA Chemical Testing Procedure or the Abbott AxSYM Testing Instrument.

The prosecution attempted to prove that Werle had a blood alcohol content above .08 grams of alcohol per one hundred milliliters or cubic centimeters of blood by using the REA chemical testing procedure and Abbott AxSYM testing instrument to test Werle's blood. As foundation for admissibility of the test results, the prosecution claims that a letter dated October 12, 2005 from DOH to Dr. Wong (Exhibit 7) updating CLH's license to conduct blood alcohol testing constitutes approval of the testing method and instrument utilized, thus establishing the foundational requirement of reliability for admissibility under the "shortcut" approach.

■ We agree with Werle that Exhibit 7 does not support a conclusion that the DUI coordinator approved the testing procedure or instrument used to test Werle's blood. A review of the "license update" letter reveals that neither the REA chemical testing procedure nor the Abbott AxSYM testing instrument are mentioned, much less approved. The prosecution's claim that Exhibit 7's general authorization by DOH to conduct blood alcohol testing "based on having fulfilled requirements of [HAR] 11–114–18(b)" attested to any testing procedure of CLH being "generally reliable," thereby fulfilling the foundational requirement of reliability, is unavailing. HAR § 11–114–22 requires that "only those blood alcohol testing procedures which have been approved in writing by the DUI coordinator shall be used," and Exhibit 7 does not show that the DUI coordinator approved the REA chemical testing procedure or the Abbott AxSYM testing instrument.

The testimony of Dr. Wong, the Toxicology Lab Director of CLH, also did not establish that the testing procedure and instrument were "approved in writing by the DUI coordinator." Indeed, the prosecution withdrew that specific question asked of Dr. Wong after objection by defense counsel, with the prosecutor stating that the prosecution would rely on Exhibit 7 instead, as CLH's updated license "speaks for itself."

The prosecution alternatively attempts to establish reliability of the REA chemical testing procedure and Abbott AxSYM testing instrument through Exhibit 10, a "Substance Abuse Testing Laboratory License" issued by the DOH, effective July 1, 2005 to June 30, 2007. The prosecution points to the License's authorization of CLH to do blood alcohol tests, the approved methodology of "ADH Enzyme," and the testimony of Jon Tsuchida, a CLH medical technologist, that the REA chemical test procedure is essentially an ADH Enzyme test, and thus the test was approved by implication. This argument is unavailing for two reasons: (1) HAR § 11–114–22 requires approval in writing of the specific blood alcohol testing procedure employed, and (2) the Substance Abuse Testing Laboratory License expressly states that it was issued pursuant to, *inter alia,* Title 11, chapter *113* not chapter 114. This is significant as chapter 113, which deals with substance abuse testing of employees, with one of the stated purposes "to protect the privacy rights of persons tested," *specifically exempts* "tests for alcohol under chapter 286 or 291, Hawai'i Revised Statutes," and Werle's test was performed pursuant to HRS chapter 291:

> *Exemptions. . . .* testing for alcohol related to chapters 286 and 291, Hawaii Revised Statutes . . . are exempt from the provisions of this chapter.

HAR § 11–113–3 (1992).[11]

In summary, the prosecution has not shown, by document or oral testimony, that the DUI coordinator gave written approval of the REA chemical testing procedure or the Abbott AxSYM testing instrument utilized to test Werle's blood alcohol. Thus the "shortcut" approach to establishing reliability of the blood alcohol test results by showing that the DUI coordinator gave written approval of the procedure and instrument used to test

Werle's blood, is not available under the record presented.

### 5. *State v. Lowther* Does Not Cure the Foundational Evidentiary Defect.

The ICA cites its decision in *State v. Lowther,* 7 Haw.App. 20, 740 P.2d 1017, to support its conclusion that the license update (Exhibit 7) fulfilled the prosecution's requirement to lay a foundation for the reliability of CLH's testing procedures. While expressly acknowledging that the DOH did not specifically approve the use of the REA chemical testing procedure or the Abbott AxSYM testing instrument, the ICA found that *"Lowther* provides strong support for the State's argument that by submitting [CLH's] license update into evidence at trial, the [prosecution] fulfilled its requirement to lay a foundation for the reliability of CLH's testing methods." ICA's Mem. Op. at 15. Werle claims that the ICA's interpretation of *Lowther* was erroneous because "the *Lowther* court's rationale and conclusion could neither be properly applied, nor analogized, to the disparate Werle facts." We agree with Werle.

*Lowther* interpreted this court's decision in *State v. Tengan,* 67 Haw. 451, 691 P.2d 365 (1984). In *Tengan,* the defendant—who had been convicted of DUI[12] based on an Intoxilyzer test—argued in relevant part that the "use of the Intoxilyzer as a breath-testing device had not been authorized by a properly adopted rule." *Tengan,* 67 Haw. at 454, 691 P.2d at 368. This court first stated that the DOH was responsible for "maintaining scientific and technical control of chemical testing for blood alcohol." *Id.* at 457, 691 P.2d at 369 (internal quotation marks omitted). This court then concluded that the rules adopted by the DOH that relate to (1) DOH's authority to approve breath alcohol testing devices and (2) the standards that must be followed, satisfied HRS chapter 91's rule-making pro-

---

11. HAR § 11–113–3 was subsequently amended in 2007; however, the exemption provided for alcohol tests under HRS chapter 291 remained in place:
> *Exemptions.* The conditions of exemption from the provisions of this chapter are the following:
> . . .
> (2) Tests for alcohol under chapter 286 or 291, Hawaii Revised Statutes[.]

HAR § 11–113–3 (2007).

12. "OUVII was formerly known as 'DUI,' Driving Under the Influence of Intoxicating Liquor, in violation of HRS § 291–4; § 291–4 was repealed in 2000, and § 291E–61 was enacted." ICA's Mem. Op. at 8 n. 4.

cedures. *Id.* at 460–61, 691 P.2d at 372. As a result, the DOH director's approval of the Intoxilyzer as a breath alcohol testing device was not subject to formal rule-making procedures. *Id.* Thus, this court held, *inter alia,* that the DOH director had properly authorized the use of the Intoxilyzer to determine breath alcohol content. *Id.*

In *Lowther,* the defendant appealed from a DUI conviction. *Lowther,* 7 Haw.App. at 21, 740 P.2d at 1018. On appeal, the defendant claimed that his due process rights were violated when the circuit court excluded expert witness testimony regarding the reliability of the Intoxilyzer as an instrument to test breath alcohol content. *Id.* at 22–23, 740 P.2d at 1019. The prosecution argued that the expert testimony was properly excluded because this court had determined that Intoxilyzer tests were inherently reliable in *Tengan.* *Id.* at 23, 740 P.2d at 1019–20.

The ICA disagreed with the prosecution's interpretation of *Tengan,* stating that

> [t]he effect of *Tengan* is to satisfy the "reliability" prong of the foundational requirements for admissibility.... It relieves the State of the burden of presenting expert testimony regarding the general reliability of the Intoxilyzer as a breath testing device in each DUI prosecution for purposes of admissibility of the test result. Nothing in *Tengan* suggests that the general reliability of the Intoxilyzer is an unquestioned fact.

*Id.* at 24, 740 P.2d at 1020 (footnote and citation omitted).

In sum, *Tengan* and *Lowther* teach that when the prosecution proves that a testing procedure has been approved by the DUI coordinator, it relieves the prosecution of the burden of presenting expert testimony to establish the reliability of that procedure.

*Tengan* and *Lowther* are distinguishable from this case. In *Tengan,* there was documentary evidence to support DOH approval of the Intoxilyzer. Specifically, in *Tengan,* "the record disclose[d that] the Director of Health approved the use of the Intoxilyzer in accord with the requirements of Chapter 47 and informed the Director of Transportation of the approval on December 16, 1980."

*Tengan,* 67 Haw. at 461, 691 P.2d at 372. In contrast, here there is no evidence in the record that shows that the DUI coordinator approved the REA chemical testing procedure or the Abbott AxSYM testing instrument for blood alcohol testing.

In *Lowther,* the trial court refused to admit expert testimony which challenged the reliability of Intoxilyzer results because the trial court erroneously believed that "the question of the reliability of the Intoxilyzer has already been determined in this state by our State Supreme Court and has been laid to rest. It is reliable[.]" *Lowther,* 7 Haw. App. at 23, 740 P.2d at 1019. As stated previously, *Lowther* merely clarified that the DOH was charged with monitoring blood and breath alcohol testing procedures and approval of a testing method and instrument would satisfy the prosecution's initial foundational burden to establish reliability of the testing method and instrument. Moreover, unlike *Lowther,* here there is no prior Hawaiʻi case law that establishes that the DOH has approved the REA chemical testing procedure or the Abbott AxSYM testing instrument for blood alcohol testing. Thus, the ICA erred in finding *Tengan* and *Lowther* dispositive in this case.

### 6. The Expert Testimony in the Record Does Not Satisfy the Threshold Requirement of Reliability for the Admission of Werle's Blood Alcohol Test Results.

■ The first *Montalbo* requirement for determining whether scientific evidence is reliable is to establish that the underlying scientific principle is valid. Dr. Wong, with a doctorate in biochemistry and as the Toxicology Lab Director and Alcohol Test Supervisor for CLH, and the person responsible for ensuring that CLH's testing instruments were properly maintained, would have been the logical witness to testify as to the validity of the scientific principles underlying the REA chemical testing procedure and the Abbott AxSYM testing instrument. Indeed, Dr. Wong was qualified as an expert witness in the field of toxicology, and ostensibly was qualified to offer expert opinions on these points. However, Dr. Wong was not asked

to explain the scientific principles underlying the REA chemical testing procedure or the Abbott AxSYM testing instrument. Instead, the prosecution relied on the testimony of CLH employee Jon Tsuchida, a medical technologist who tested one of Werle's blood samples. Mr. Tsuchida had a bachelor's degree in medical technology, and his training for blood alcohol testing was "on the job." He had approximately seven years of work experience with approximately 1500 blood tests at the time he tested Werle's blood sample. As described by HAR § 11–114–20, Mr. Tsuchida's job was that of an Alcohol analyst:

> *Alcohol analysts.* (a) Alcohol analysts shall:
> (1) Perform alcohol testing of blood and other bodily substances;
> (2) Use testing procedures approved by the department; and
> (3) Keep records required by the alcohol testing supervisor.

HAR § 11–114–20(a) (1993).

■ Mr. Tsuchida's job was thus analogous to that of an "operator" of a breath alcohol testing instrument under HAR § 11–114–10.[13] While Mr. Tsuchida was qualified to describe the procedures he followed to obtain Werle's blood alcohol test results, and state the test results as shown by the testing instrument, he was, unlike Dr. Wong, not qualified as an expert in the field of toxicology entitled to testify about the validity of the scientific principles underlying either the REA chemical testing procedure or the Abbott AxSYM testing instrument. While the district court erroneously allowed Mr. Tsuchida to explain his understanding that the REA chemical testing procedure was based upon "Beer's Law," a scientific law he learned in school that described the relationship between color change and the concentration of substance, in this case alcohol, Mr. Tsuchida did not testify as to the general reliability and acceptance of the REA chemical testing procedure or the validity of the

scientific principles underlying the Abbott AxSYM testing instrument. In addition, Mr. Tsuchida candidly admitted that he could not explain how the Abbott AxSYM testing instrument used to test Werle's blood worked:

Q. You relied on the internal workings of like how the machine works as far as turning it on and getting the results; true?

A. Yes

Q. But with respect to you being qualified as an expert, to tell the Court how the machine actually does its analysis, you can't do that, can you, sir?

A. Not exact because I haven't—I didn't actually, manufacture the instrument so I can't tell you, yeah.

Q. The work that you performed, basically, is a technician that knows how to operate a machine; true?

A. Correct

Q. Knows how to turn it on and do all of the verifications that the manufacturer requires; true?

A. Correct

Q. And then to read basically the results of what this machine states is the result; true?

A. Correct[.]

In summary, there was insufficient competent testimony in the record to establish the foundational reliability of Werle's blood alcohol test results under the *Montalbo* reliability requirements. Neither Dr. Wong's testimony nor Mr. Tsuchida's testimony established the validity of the scientific principles underlying the REA chemical testing procedure and Abbott AxSYM testing instrument, or the validity of the technique applying the principles. As a result, the prosecution did not meet its burden to lay a proper foundation for introduction of Werle's blood alcohol test results, and the district court abused its discretion when it admitted the test results into evidence. The

---

**13.** HAR § 11–114–10 provides in relevant part:
(a) Operators of breath alcohol testing instruments shall be responsible for performing breath alcohol tests pursuant to section 11–114–6 and record keeping pursuant to section 11–114–12(b)(1).

(b) No person shall serve as an operator unless the person has a valid supervisor's license pursuant to section 11–114–9(b), or has a valid operator's license issued by the chief of police.
. . . .
HAR § 11–114–10 (1993).

ICA thus erred by affirming the district court's admission into evidence of Werle's blood alcohol test results without a proper foundation.[14]

## IV. CONCLUSION

Based on the foregoing, we reverse Werle's conviction for OVUII and vacate the ICA's Memorandum Opinion and Judgment.

14. It should be noted that we express no opinion herein on the merits of the REA chemical testing procedure or the Abbott AxSYM testing instrument. This opinion is limited to the evidentiary issue presented, *i.e.*, whether a proper foundation was laid for introduction into evidence of Werle's blood alcohol test results.